(C. D. 1513)

JAMES E. RING v. UNITED STATES

United States Customs Court, Third Division

(Decided April 2, 1953)

Plaintiff not represented by counsel.
*Charles J. Wagner*, Acting Assistant Attorney General (*Harold L. Grossman*, special attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: This is a protest against the collector's assessment of duty on certain oil paintings, imported from Hungary on March 30, 1950, at 10 per centum ad valorem under paragraph 1547 (a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as works of art, not specially provided for, including paintings in oil or copies, replicas, or reproductions of the same. It is claimed that the merchandise is entitled to free entry under paragraph 1807 of the said tariff act as original paintings in oil.

The pertinent provisions of the tariff act are as follows:

PAR. 1547 (a) [as modified by the General Agreement on Tariffs and Trade, T. D. 51802]. Works of art, not specially provided for:
Paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same_____ 10% ad val.

PAR. 1807. Original paintings in oil, mineral, water, or other colors, pastels, original drawings and sketches in pen, ink, pencil, or water colors, artists' proof etchings unbound, and engravings and woodcuts unbound, original sculptures or statuary, including not more than two replicas or reproductions of the same; * * * and the words "painting," "drawing," "sketch," "sculpture," and "statuary" as used in this paragraph shall not be understood to include any articles of utility or for industrial use, nor such as are made wholly or in part by stenciling or any other mechanical process; * * *. [Free.]

The shipment herein included 8 parcels entered as follows: Invoice No. 1 covered 6 paintings, which were entered as works of art under paragraph 1547, *supra*. Invoice No. 2 covered 617 paintings, 523 of which were entered as free of duty under paragraph 1807, *supra*, and 94 of which were entered under paragraph 1547, *supra*. It is claimed in the protest that the said 523 paintings are originals,

entitled to free entry under paragraph 1807. However, during the course of the trial the plaintiff limited his claim to 321 pictures which were alleged to be original paintings. No question has been raised as to their being articles of utility or imported for industrial use.

James E. Ring, the plaintiff herein, appeared in person at the trial and testified on his own behalf. He stated that he is a painter himself, has "finished the academy," and is qualified to say what is an original painting and what is a duplicate. In his opinion, an original painting is one that an artist conceives, whether from memory or impression or made from a live subject or still life, without trying to imitate or copy exactly another picture.

Mr. Ring testified that in 1948 he spent 2 months in Hungary and had some pictures made but could not take them out then because he failed to agree with the Hungarian Government on the price. In the following year, he spent over 2 months there and made a contract with Artex, an agency of the Hungarian Government, to purchase approximately 3,000 paintings, some of which were to be originals from which copies would be made. He introduced into evidence the first page of this contract, which is in the Hungarian language, and a translation thereof. He stated that he had made the translation himself, but had added certain figures to show the measurements of the pictures in inches and feet and the prices in American dollars equivalent to the Hungarian forints in the original. He added that although the prices were given in forints in the contract, it was later agreed that bills would be rendered in dollars, the amount being determined at a rate a little over the official rate.

The translation of the contract, dated October 15, 1949, with the additions made by Mr. Ring, contains the following:

* * * Painters' workpay (wages) is to be the minimum wage scale for quantity work (copies):

| | | | | | Quantity (Hung.) | work |
|---|---|---|---|---|---|---|
| 1. | 21 X 26.5 cm | equals American sizes | 8″ X 10″ | 16 forint | | $1.20 |
| 2. | 30.5 X 40.7 cm | " " | " 12″ X 16″ | 25 | " | 2.00 |
| 3. | 41 X 51 | " " " | " 16″ X 20″ | 35. | " | 2.90 |
| 3A. | 41 X 51 | " figurework | " 16″ X 20″ | 55. | " | 4.10 |
| 4. | 61 X 76.2 | " landscape | " 24″ X 30″ | 48. | " | 4.25 |
| 4A. | 61 X 76.2 | " figurework | " 24″ X 30″ | 73. | " | 5.65 |
| 5. | 61 X 96.5 | " landscape | " 24″ X 36″ | 55. | " | 5.20 |
| 6. | 71 X 96.5 | " " | " 28″ X 38″ | 65. | " | 5.75 |

The painters wage scale for individual pictures (originals) should be the above mentioned amounts plus 75%.

Mr. Ring testified that to his own knowledge 321 of the pictures purchased were originals. He stated that he had personally selected the artists to make the paintings, had planned the pictures with them, and had laid out sketches and color schemes, so that the finished products would be suitable for the American market. He said that

about 75 per centum to 80 per centum of the pictures were made under his personal supervision, that is, he was present when the pictures were planned and partially painted, but he could not wait until they were worked out in all details.

Mr. Ring introduced into evidence a group of invoices or bills from Artex, bearing dates between November 9, 1949, and March 16, 1950, inclusive. These include all the bills he received in connection with this transaction of over 3,000 pictures. He stated that the paintings designated on the invoices as "samples" were originals and those designated as "series" were copies. On all of the originals, he had to pay 75 per centum more insofar as the labor cost was concerned. Figure work cost approximately 50 per centum more than landscapes.

Counsel for the Government stated during the course of the trial that the examiner could not determine from the paintings alone whether they were originals within the meaning of the tariff act and that he had desired to have a foreign investigation made, but Hungary does not permit American officials to make such investigations within its borders. Mr. Ring also attempted to get statements from the artists in Budapest through the American Embassy but was unable to do so.

From the evidence submitted, which apparently is all that can be obtained, the court must determine whether plaintiff has established that any of the disputed paintings are originals.

An examination of the invoices introduced by Mr. Ring reveals that 321 paintings out of more than 3,000 were designated "samples," and were sold at prices higher than those set forth in the contract. Sizes other than those mentioned in the contract are included, but the prices for those labeled "samples" are higher than those labeled "series." The invoices indicate that the following prices were charged for the two classes of paintings:

| Size and description | | "Series" | "Samples" |
|---|---|---|---|
| 10 x 14. 5 cm. | | $ . 75 | |
| 10 x 14. 5 " | figures | . 85 | |
| 21 x 26. 5 " | | 1. 20 | $1. 90 |
| 21 x 26. 5 " | figures | 1. 75, 1. 80 | |
| 30.5 x 40. 7 " | | 2. 00 | 3. 10 |
| 30.5 x 40. 7 " | figures | 3. 00 | 5. 25 |
| 41 x 51 " | | 2. 90 | 4. 25, 4. 40 |
| 41 x 51 " | figures | 4. 10 | 6. 50 |
| 41 x 61 " | | 3. 10, 3. 15 | 5. 19 |
| 41 x 61 " | figures | | 7. 64 |
| 51 x 61 " | | 3. 40 | 5. 47 |
| 51 x 61 " | figures | 4. 65 | 7. 05, 7. 64, 8. 75 |
| 61 x 76. 2 " | | 4. 25 | 6. 35 |
| 61 x 76. 2 " | figures | 5. 65 | 8. 75, 8. 80 |
| 61 x 96. 5 " | | 5. 20 | 7. 60 |
| 71 x 96. 5 " | | 5. 70, 5. 75 | |
| 27 x 37 " | monk on wood | 5. 57 | 8. 75 |

Mr. Ring's testimony establishes that a portion of the paintings involved in the transaction are originals, since he was present when they were planned and painted, and he was qualified to state what was and what was not an original. The documentary evidence shows that 321 paintings were designated "samples," that is, originals, and were higher in price. From this, we conclude that 321 pictures out of the entire 3,000 or more were originals.

The next problem is to find how many of the said 321 originals are included in the importation before us. As stated above, the shipment did not cover the entire 3,000 or more paintings contracted for, but. included 6 paintings, not here involved, and a group of 617 paintings. The pictures in the latter group are enumerated and described on 15 lists attached to the consular invoice. Those lists are not the same as any of the invoices submitted by Mr. Ring nor does there appear to be any way to relate them to each other. However, the lists do give the description, size, and price of each picture. By using the above table as a guide, we find that 93 out of the 617 paintings are listed at the prices given for "samples" while the balance are at the prices given for "series" paintings.

In view of the evidence that the word "samples" designated originals and that the prices for "samples" were higher, we find that the paintings on the following lists attached to the consular invoice are original oil paintings entitled to free entry under paragraph 1807, *supra*:

List II, "11 pcs. original oil paintings"
List IV, "10 pcs. original oil paintings"
List VI, "5 pcs. original oil paintings"
List VIII, "19 pcs. original oil paintings"
List IX, "7 pcs. original oil paintings," except item No. 5, "Jancsek Antal Two women 51 x 61 4.64"
List X, "5 pcs. original oil paintings"
List XI, "14 pcs. original oil paintings"
List XIV, "14 pcs. original oil paintings"
List XV, "9 pcs. original oil paintings"

To that extent the protest is sustained. Judgment will be rendered accordingly.